# EDWARD W. GRIFFIN *et al.*

*v.*

# THE MARINE COMPANY OF CHICAGO *et al.*

1. MORTGAGEE—*purchasing at his own sale.* A mortgagee of real estate, selling under a power, can not become the purchaser at his own sale, unless by consent of the mortgagor.

2. SAME—*construction of a mortgage, on that subject.* A mortgage, with a power of sale in the mortgagee, contained this clause: "It shall be lawful for the said party of the second part, his representative or assigns, to become purchaser at said sale, or any member or members of the firm of H. A. Tucker & Co.," (H. A. Tucker being the mortgagee), "may become a purchaser at such sale, provided his or her bid for said property, or any portion thereof:" *Held,* that it was apparent the right of the mortgagee to purchase at the sale was intended to be upon conditions, which were not fully expressed, and the language in that respect being unintelligible, the entire clause must be disregarded. The power to become a purchaser at the sale was not conferred upon the mortgagee.

3. CONSTRUCTION—*the rule in such cases.* Where it is claimed that a mortgage confers upon the mortgagee the right to purchase at his own sale, under a power in the mortgage, the instrument, in that regard, will be strictly construed. Such a privilege the law does not give to the mortgagee, and does not favor, and if claimed under a clause in the mortgage, he must show it has been given in clear and unmistakable terms.

4. Such a clause in a mortgage is analogous to one providing that the mortgagee may purchase the equity of redemption at a fixed price, and places the mortgagor substantially at the mercy of the mortgagee. Whether it would be void, as being extorted from the necessities of the mortgagor, or whether the mortgagee, acting under it, would be required to show, against a claim by the mortgagor to redeem, that the sale had been fair, and the property had brought a reasonable price, is not decided, but upon the question whether the language used does confer the right, it must receive a strict construction, being regarded with disfavor by the courts.

5. MORTGAGES—*of the mode of foreclosure—as to real estate and personalty.* Where a mortgage of real estate provided as the mode of foreclosure, that the property should be sold at public sale by the mortgagee, at a specified place, and after advertising for a given time, it was *held,* this cut off the right of private sale by the mortgagee.

6. And if such a provision should be contained in a mortgage of personal property, it is not perceived what right the mortgagee would have to disregard it and sell the property at private sale.

7. REALTY AND PERSONALTY—*of a leasehold interest.* A lessee of a lot of ground erected a building thereon, under an agreement with the lessor that the former might remove all the improvements placed by him on the premises, or the lessor should pay for them at their appraised value; and in case of removal, rent was to be paid upon an appraisement to be made at certain intervals, without regard to the improvements. The lessee and owner of the improvements executed a mortgage upon his interest in the premises, including the improvements, and it was *held,* the property mortgaged was an actual interest in real estate, a chattel-real at the common law, falling under the definition of "real estate," given in the first section of our statute of judgments and executions, and, because immovable, possessing none of those attributes as personal property which have shaped the law in regard to the mortgage of such property.

8. TRUSTEES' SALES—*of the notice required on their adjournment.* It has been held that a trustee in a deed of trust may adjourn a sale in his discrecretion, but when he does so, he must give a new notice for the same length of time required in the first instance.

9. Nor is this rule in regard to the notice, affected by the fact that the deed contains a clause authorizing an adjournment; such a clause is not material, as the power exists without it.

10. MORTGAGEE IN POSSESSION—*of his relation to the mortgagor.* Although, in a limited sense and for some purposes, a mortgagee in possession for condition broken, and without foreclosure, is a trustee for the mortgagor, yet he is not so in a strict sense and for all purposes, to the extent of disabling him from dealing with the mortgaged property, under any circumstances, for his own benefit.

11. The general rule may be thus stated: if a mortgagee "gets an advantage by being in possession, or 'behind the back' of the party interested in the subject, or by some contrivance in fraud, he shall not retain the same for his own benefit, but hold it in trust;" subject to this general rule, each case must stand on its own equities.

12. So, if the purchase of an outstanding title by the mortgagee has been accomplished by means of a friendly possession derived by him from the mortgagor, and the latter has had no opportunity to purchase for himself, the former should hold his purchase for the benefit of the mortgagor.

13. If, on the other hand, his possession is adverse, or his purchase has not been aided by it, or the mortgagor has had the opportunity to buy and has declined, there can be no reason for holding the mortgagee a trustee.

14. SAME—*who will be deemed to hold the position of a mortgagee in possession.* A mortgagee of a lease, upon condition broken, took possession,

Syllabus.

and then, under a power in the mortgage, sold the property mortgaged, and became the purchaser at his own sale without having any right so to do. He afterwards sold and conveyed his interest, his grantee taking possession and leasing the premises to a third person, the latter entering into possession under his lease. This last lessee, while thus in possession, purchased in the outstanding title for his own benefit: *Held,* that he was in no such relation to the mortgagor, the original lessee, as to constitute him the trustee of the latter. He was not a mortgagee, and owed no allegiance, as regarded his possession, to the mortgagor, nor was there any privity between them, but he held the title he had acquired, independently of, and adverse to, the mortgagor.

15. The possession even of a mortgagee, after an attempt at foreclosure by sale under a power in the mortgage, would be adverse to the mortgagor, although the foreclosure be invalid at the election of the latter, by reason of the mortgagee purchasing at his own sale, and a person holding as tenant under the grantee of such mortgagee would occupy no fiduciary relation to the mortgagor which would prevent him from acquiring an outstanding title for his own benefit.

16. MORTGAGOR OF A LEASE—*of his rights after an invalid foreclosure, as against a subsequent occupant and owner of the fee.* Nor would the fact that the lease of the mortgagor provided that he might retain possession until his improvements were paid for or secured, give him an interest in the fee, or any right to purchase, or even to be restored to the possession, as against the party who had acquired the fee under the circumstances named, upon a bill filed by the mortgagor, to determine his rights in the premises, a decree was entered securing to him payment for his improvements by a lien on the ground, and that fully met all his just claims for relief.

17. USURY—*what constitutes.* A note executed in this State, payable in New York, renewable at intervals of sixty or ninety days, the maker paying the exchange, is not usurious.

APPEAL to the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Mr. J. A. SLEEPER and Mr. J. D. CATON, Messrs. DENT & BLACK, for the appellant.

Messrs. SCAMMON, McCAGG & FULLER, for the Marine Company.

Mr. JOHN N. JEWETT, for the appellee, Wheeler.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

The long litigation, of which the history is disclosed in this record, had its origin in certain transactions, which we will briefly state in their chronological order, so far as they have any material bearing upon the case, in the view we have taken of it. Many minor points have been more or less discussed by counsel, to which we do not deem it necessary to advert.

On the 2d of November, 1851, John S. Wright leased lots 3 and 4, block 5, in Chicago, to George A. Gibbs and Michael Tiernan, for a term commencing November 22, 1851, and ending December 1, 1856. In 1854, Tiernan assigned his interest in the lease to Gibbs, and the latter then formed a partnership with Edward W. Griffin, the complainant, and appellant herein. The firm of Gibbs & Griffin continued the transportation and warehouse business upon said property, and soon conceived the plan of erecting upon said lots a large elevator. In order to do this with safety to themselves, it was important to procure from Wright a supplemental agreement, which was done.

The original lease provided for its renewal for the term of five years, according to certain terms endorsed thereon, and also contained a provision that the lessees might remove from the premises all improvements placed there by them, or have them appraised by disinterested persons, and the lessor should pay for them in six and twelve months at their appraised value. The terms of renewal endorsed on the lease were, that the premises should be appraised, without regard to the improvements, by three freeholders to be appointed by the circuit or county judge, and the rent should be seven per cent. upon the appraised value until another appraisal, which might be had every two years.

By the supplemental agreement made September 19, 1854, Edward W. Griffin is recognized as the assignee of Tiernan; the clause of the original lease, relating to the improvements,

was made to apply to the close of the second term of five years, and then follows this provision : " It is hereby further stipulated and agreed between the parties hereto," (Wright of the first part, and Gibbs & Griffin of the second part) "that said Gibbs & Griffin shall, at the expiration of ten years mentioned in the said original lease, have the right, after the expiration of the said ten years, to continue in the possession of said premises until the said Wright shall have paid the appraised value of the improvement thereon, according to the terms of said lease, the said Gibbs & Griffin paying rent for said land according to the terms of the last preceding estimate or appraisement of the value of said premises, to said Wright; or if the said Wright shall so prefer, he may extend the said lease for a longer period than ten years, by having appraisement of said premises made, according to the terms and conditions of said lease, or he may take possession of said lots leased by giving security for the appraised value of the buildings and improvements on said leased lots, to the said parties owning said improvements, which security shall be held and deemed to be sufficient for the purpose by the president of some one of the banking institutions then existing, said president to be agreed upon by said parties."

After the making of this supplemental agreement, Gibbs & Griffin proceeded with the erection of their elevator, which they completed in the spring of 1855, at a cost, it is alleged, of $91,500. In the process of building, they had borrowed a large sum of money from Hiram A. Tucker, a banker in Chicago, and a relative of both members of the firm, all of which they repaid in 1855 and 1856, during which years their business was exceedingly profitable. There was, however, an individual indebtedness from Gibbs to Tucker of about $30,000, and in February, 1857, Tucker insisted on its payment by Gibbs, or its assumption by the firm. As security for the debt, Tucker held the title to a mill and distillery property in Clintonville, Kane county, and also a mortgage upon Gibbs' interest in 11.41 acres in section 11, township 39,

range 13, called, in this case, the West Lake Street property, for the purchase of which Gibbs held a contract. The firm took these two pieces of property, and assumed Gibbs' debt to Tucker, agreeing to give a mortgage on the elevator. No mortgage, however, seems to have been executed at that time, but in the spring of 1858, the firm found itself in need of capital to carry on their business, and applied for aid to Tucker, and also to the Marine Insurance Company of Chicago. On balancing their accounts with Tucker, they were found indebted to him $29,000, and he advanced them $10,000 in money, and took from them notes for $39,000, secured by a mortgage on their lease-hold interest and elevator. The Marine Company, at the same time, advanced $15,000, with the understanding that more would be advanced thereafter, which was, in fact, done, and took from the firm an absolute deed of the lease-hold interest and elevator, subject to Tucker's mortgage, and also of the West Lake Street property, the mill and distillery property at Clintonville, and a house and lot standing in the name of Mrs. Griffin. The company gave back a defeasance, showing the true character of the transaction, and providing that it should have a lien on the property for advances made, within two years, to an amount not exceeding $30,000. The defeasance further provided for a sale of the property, in default of payment, after advertisement for sixty days.

Gibbs & Griffin, having made default upon their paper due Tucker, the latter, early in the year 1859, took possession of the elevator, and advertised it for sale in pursuance of the terms of his mortgage. It had at that time ceased to do business. The sale took place on the 14th of May, 1859, and the property was bid in by Tucker for $42,000. He soon afterwards conveyed his interest to Carver, the secretary of the Marine Company, for $45,000. The Marine Company had also advertised for a sale under their mortgage, as it will be convenient to designate the deed and defeasance, to be held on the 18th of May, 1859, but it was twice postponed,

and finally held on the 18th of July, 1859. The sale was, of course, subject to the Tucker incumbrance, and John Forsyth, who seems to have been in the frequent habit of transacting business for the Marine Company, bid in the property in his own name, for the nominal sum of $50 for the elevator, and $120 for the West Lake Street property. A few months later, Carver conveyed the elevator to Forsyth for the benefit of the company. Carver, however, while he held the title, had leased the elevator to Hiram Wheeler, the appellee herein, at an annual rent of $15,000. Wheeler took, and has ever since retained, possession.

In the meanwhile, the legal title to the lots on which the elevator stood had passed out of John S. Wright, the original lessor, and Timothy Wright had become the owner of one, and Francis A. Hoffman of the other, subject, of course, to the conditions of the lease. In the summer of 1861, Wheeler bought from Hoffman the fee of lot 4, and in October of the same year, from Wright, the fee of lot 3, Wheeler being in possession under his lease from Carver at the date of both purchases. Before the purchase, and on the 29th of May, 1861, Gibbs & Griffin notified Wright and Hoffman that they did not recognize the right of Forsyth, or of the Marine Company, to control the premises, and that it was their intention to terminate the lease on the 1st of December, 1861. These notices were delivered by Wright & Hoffman to Wheeler, who, on the 8th of October, 1861, served Gibbs & Griffin, and all other parties interested, with a notice that, at the expiration of the term, he would be ready to proceed with an appraisal of the improvements in the manner prescribed in the lease, and to perform all the covenants made and entered into by said Wright in said instrument.

Gibbs & Griffin took no steps towards having the improvements valued, but on the 14th of December, 1861, commenced this suit for the purpose of setting aside the sales under their mortgages, and praying that they be permitted to redeem and be restored to possession, and also asking such further relief

as the case might require.  The Marine Company, and the various persons interested in the property were made parties. The defendants answered, and replications having been filed, a great amount of testimony was taken.  Before the cause came on for a final hearing, the complainants asked leave to amend their bill for the purpose of claiming against Wheeler the fee of the lots bought by him, on the ground that his position was such in reference to the property at the time of his purchase as to give the complainants the right to treat him as their trustee.  The motion for leave to amend was reserved by the court until the hearing.  The case having at length come to a hearing, the court pronounced a decree setting aside the sales under the mortgages, and permitting the complainants to redeem.  The cause was referred to a master, who was directed to state an account, charging the complainants with whatever was due Tucker or the Marine Company, with interest to December 1, 1861.  The complainants were to be credited with the value of the warehouse on that date, and with the rental to that time from the time the defendants, or any of them, took possession.  Both parties excepted to the master's report, but the court overruled the exceptions, and, on the 2d of August, 1869, the court made the final order, fixing the annual rental at sixteen thousand dollars, payable monthly, with interest, and the value of the elevator improvements, on the 1st day of December, 1861, at $72,000, and found a balance due the complainants of $17,206.06, for which, with interest thereon from December 1, 1861, it rendered a decree.  The decree also provided that the other property included in the mortgages should be released from the lien thereof.  From this decree Griffin appealed, his co-complainant, Gibbs, having died pending the suit.

After the commencement of the suit, namely, on the 1st day of March, 1862, Wheeler, having, as already stated, previously acquired the fee of the lots, bought from the company the elevator improvements for the sum of fifty thousand dollars.  J. Young Scammon gave him his personal bond of

indemnity for the same sum, agreeing, to that amount, to hold him harmless against the claims of Gibbs & Griffin. The rents charged in the decree to the company, and the $50,000 received by it from Wheeler, together paid the debt due the company on the mortgages, lacking $4793.94, and at the request of the defendants, the court, in its decree, directed that sum to be paid by Wheeler to the company. No error is assigned on that provision of the decree, and, indeed, the equities of Wheeler and the company, as against each other, have not been presented in the argument. So far as this record and the argument have disclosed, these defendants are in accord.

The appellees have assigned cross errors, questioning the action of the court in holding the sales invalid and the mortgages redeemable, and as this question lies at the foundation of the suit, we will first consider it.

The sale under the Tucker mortgage was attacked on various grounds, but the circuit court held it invalid because Tucker, the mortgagee, was the purchaser at his own sale. That a mortgagee of real estate, selling under a power, can not become the purchaser at his own sale, unless by consent of the mortgagor, is perfectly well settled, and is not denied. The two positions of vendor and purchaser are irreconcilable.

In answer to this objection, it is claimed, by counsel for appellee, that the interest of the mortgagees in the lease and elevator was personal property, and, being such, if the mortgagee obtained possession after condition broken, his legal title became complete, and without reference to the public sale under the power, his subsequent private sale to Carver was a valid foreclosure of the equity of redemption. The conclusive answer to this position is, that the property mortgaged was an actual interest in real estate, a chattel-real at the common law, falling under the definition of "real estate," given in the first section of our Statute of Judgments, and Executions, and, because immovable, possessing none of those attributes of personal property which have shaped the law in

regard to the mortgage of such property. But what is still more conclusive is, that the parties, by the very terms of their mortgage, treat the property as real estate, and provide, as the mode of foreclosure, that it shall be sold at public sale to the highest bidder at the door of the court house, after advertising for sixty days. Nothing can be plainer than that this cuts off the right of private sale, and if such a provision should be contained in a mortgage of property strictly personal, we do not see what right the mortgagee would have to to disregard it.

But it is further claimed, in answer to this objection to the sale, that the mortgage, by its terms, authorized the mortgagee to buy at the sale. We have not found the question thus raised free from difficulty. We have, however, arrived at the conclusion that the mortgage can not fairly be construed to contain such an authority. The clause relied upon as conferring the power reads as follows :

" It shall be lawful for the said party of the second part, his representatives or assigns, * * * to become purchaser at said sale, or any member or members of the firm of H. A. Tucker & Co., may become a purchaser at such sale, provided his or her bid for said property, or any portion thereof."

All that can fairly be claimed for this clause is, that it indicates the parties recognized the fact that the mortgagee could not purchase except by permission of the mortgagor, and agreed upon certain conditions upon which he might purchase, but, probably by the oversight of the scrivener, neglected to embody their agreement in the mortgage in an intelligible shape. Was the mortgagee to bid the full value of the property, or a certain proportion of its value? What would have been the condition if the broken sentence had been completed? It is impossible to say. Counsel urge that the proviso is void because unmeaning, and should be disregarded, leaving the residue of the sentence in full force. But

140        GRIFFIN *et al. v.* M. CO. OF CHICAGO *et al.* [Sept. T.,

Opinion of the Court.

the mortgagee is claiming a privilege which the law does not give him, and does not favor. If he has it, it is because the mortgage has expressly given it to him, and he must show it has been given in clear and unmistakable terms. The mortgage, in this respect, is not to be construed in his favor. It has been held that a stipulation in a mortgage, that the mortgagee may purchasé the equity of redemption at a specified price, is void, because considered as extorted from the necessities of the mortgagor. 1 Hilliard on Mort. ch. 4, secs. 11 and 12, and cases cited in Notes, 3d Edition.

Without committing ourselves on the question whether such a provision would be void, or whether the mortgagee, acting under it, would be required to show, against a claim by the mortgagor to redeem, that the sale had been fair, and the property had brought a reasonable price—without, we say, expressing an opinion on these points, it is very clear that this clause must be regarded with disfavor by the courts, and must be strictly construed. It is analogous to a clause providing that the mortgagee may purchase the equity of redemption at a fixed price, and places the mortgagor substantially at the mercy of the mortgagee.

Construing the clause in the present mortgage in the light of these principles, we must hold it shows merely that an understanding of some kind was had between the parties, which is so imperfectly and unintelligibly expressed in the mortgage that we can not ascertain what it was from this incomplete sentence, and must disregard the entire clause. We are the more ready to take this view, because property which has been valued by the court as worth, on the 1st of December, 1861, $72,000, and which, a few months after the sale, rented for about $8000 in excess of the ground rent, brought but $42,000 under the elder mortgage, the purchaser, if the sale was valid, taking a paramount title.

We must next consider the effect of the sale under the mortgage to the Marine Company. The objection to that sale is the insufficiency of the notice. The mortgage

required sixty days' advertisement. The sale was first advertised to take place May 18, 1859. On the morning of that day, a notice was inserted in the paper that the sale was postponed to June 17th, and we do not find that any notice of the adjournment was given at the time when and place where the sale was to have been held. On the 18th of June, another notice of postponement until the 18th of July was published, and on that day the sale was held. This court decided, in *Thornton* v. *Boyden*, 31 Ill. 200, that a trustee in a deed of trust may adjourn a sale in his discretion, but when he does so, he must give a new notice for the same length of time required in the first instance. The court say the first notice is exhausted.

Counsel attempt to distinguish the case at bar from the one cited, by the fact that, in the mortgage to the Marine Company, there was a clause authorizing an adjournment. But the court, in *Thornton* v. *Boyden*, say, it is not material that the deed should provide for an adjournment, as the power exists without it, but when an adjournment is made, there must be a new advertisement, such as was first required. In the case at bar, the sale, which took place on the 18th of July, had been advertised for that date only thirty days, and the mortgage permitted a sale only after sixty days' notice. As Forsyth, who bought at the sale, bid in the property for the nominal sum of fifty dollars, and as he has, in all this matter, evidently acted for the company, he can set up no equitable claims as an innocent purchaser. The objection to the sale is well taken.

Having disposed of the cross errors which question the right of the appellant to any species of relief, we proceed to consider those assigned by appellant, which are based upon the theory that the measure of relief granted by the circuit court was wholly inadequate.

It is claimed by counsel for appellant, that Wheeler occupied the position of a mortgagee in possession, without foreclosure; that, in that position, he was but a trustee for the

142    GRIFFIN *et al. v.* M. CO. OF CHICAGO *et al.* [Sept. T.,

Opinion of the Court.

mortgagors, and, in consequence of his fiduciary relation towards them, was disabled from dealing with the mortgaged property for his own benefit, and that Griffin and the heirs of Gibbs are entitled to a conveyance from Wheeler of the fee of the elevator lots upon reimbursing their cost, and also to an account from Wheeler, not only of the rent of the elevator, but also of all the profits which he has made from the business he has transacted in connection therewith.

In the view of the case upon which this demand is based we can not concur. We can not concede that a mortgagee in possession occupies a fiduciary relation to the extent which is here claimed, nor can we admit that Wheeler occupied the position of a mortgagee who has taken possession for condition broken, without attempting to foreclose.

We had occasion, in the case of *Moore* v. *Titman,* 44 Ill. 368, to investigate, with a good deal of care, the doctrine of the books in regard to the relation between a mortgagor and a mortgagee in possession. The conclusion, we then arrived at, and to which we still adhere, after the argument in the present case, is, that although, in a limited sense, and for some purposes, the mortgagee in possession for condition broken, and without foreclosure, is a trustee, yet he is not so in a strict sense and for all purposes. What was said by Chancellor KENT, in *Hobridge* v. *Gillespie,* 2 J. C. R. 30, doubtless approaches as nearly to a general rule as can be given. He says if a mortgagee " gets an advantage by being in possession, or ' behind the back ' of the party interested in the subject, or by some contrivance in fraud, he shall not retain the same for his own benefit, but hold it in trust." Subject to this general rule, each case must stand upon its own equities. If the purchase of an outstanding title has been accomplished by means of a friendly possession derived by the mortgagee from the mortgagor, and the latter has had no opportunity to purchase for himself, the former should hold his purchase for the benefit of the mortgagor. If, on the other hand, his possession is adverse, or his purchase has not been

aided by it, or the mortgagor has had the opportunity to buy and has declined, there can be no reason for holding the mortgagee a trustee.

Applying this principle, the courts of England and of this country have held, if a mortgagee of a lease enters for condition broken, and while in possession obtains a renewal of the lease, he shall hold such renewal for the benefit of the mortgagor, because it is the custom of landlords, other things being equal, to give a preference to a tenant in possession. In such cases, courts assume the mortgagee to have obtained the renewal by means of his possession. Most of the cases in which this particular point has been decided have arisen in England, where leasehold interests are more common than in this country, and where the renewal of leases is almost a matter of course. But even in England, the courts hold that the rule is not so broad as to prevent a person in possession under a limited estate, from purchasing an outstanding fee to his own use. *Hardman* v. *Johnson,* 3 Merivale, 347 ; *Norris* v. *Le Nere,* 3 Atk. 26. See also *Randall* v. *Russell,* 3 Merivale, 190. So, too, it was distinctly decided by the supreme court of Florida, in *Harrison* v. *Roberts,* 6 Fla. 711, and by the supreme court of Alabama, in *Walthall's Exec.* v. *Rives,* 34 Ala. 92, that a mortgagee may purchase, to his own use, an outstanding title. See also *Cameron* v. *Irwin,* 5 Hill, 280. Of course, if he has entered for condition broken, and his possession is not adverse, he must surrender possession to the mortgagor before setting up his newly acquired title, but this rule, as we shall hereafter show, has no application to Wheeler in the present case. In short, no authority has been cited in the present case, nor was there in *Moore* v. *Titman, ubi supra,* nor have we met any authority in our own examination, in which a mortgagee has been required to surrender to his mortgagor an outstanding title bought by him, simply on the ground that he bought while in possession. If there are circumstances in the case making it inequitable in the mortgagee to retain the title purchased, as where the mortgagor has had

no opportunity of buying, and the mortgagee has effected a favorable purchase by means of his possession, an application to a court of equity would undoubtedly have very great force. As this court said in *Moore* v. *Titman,* although "the relation of trustee and *cestui que trust* may not be created by the execution of a mortgage, as between mortgagor and mortgagee, still they are not on the same footing as strangers to the estate."

That distinguished jurist, Chief Justice SHAW, in the case of *King* v. *The State Mutual Fire Ins. Co.* 7 Cush. 7, used the following language in regard to the argument of counsel, that the mortgagee was trustee of the mortgagor : "But, in truth, he is not such trustee. Nothing, an eminent judge has said, is so likely to mislead as a simile. In some very limited respects, a mortgagee is a trustee, as when he has entered and is in the receipt of rents and profits, he is liable to account therefor, and, in that respect may be denominated a trustee." He was not speaking in reference to such a question as that before us, but his language shows to what a limited extent he regarded the relation as strictly one of trust. We have had occasion, in a case decided at the present term, to differ from some of the conclusions to which he arrives in the case cited, but not from his position in this respect.

Our conclusion, then, is, that a mortgagee, though in possession for condition broken, is a trustee for the mortgagor only in a limited sense, and that he is so in purchasing an outstanding title does not necessarily follow from the existence of the relation, but must depend on the circumstances and equities of the individual case.

What, then, was the position of Wheeler in the case at bar? Counsel for appellant insist he is to be regarded as a mortgagee in possession and a trustee. If this be so, it must be because he either did, in fact, enter and hold under the mortgagor, and as a trustee, or because, whatever was the actual character of his possession, the law will not permit it to be regarded as adverse to the mortgagor. That it was, in

fact, adverse, admits of no debate. There was not the slightest privity, in fact, between him and the mortgagor. He entered and held, not under the mortgagor, but under Carver, who claimed as purchaser, and adversely to the rights of the mortgagor. Did the law, then, forbid Carver or his tenant to claim an adverse possession?

This question has been settled in this court by an important and well considered decision directly upon the point. We refer to the case of *Chickering* v. *Failes*, 26 Ill. 519. In that case, the court held that, although a mortgagee in possession does not hold adversely to the mortgagor, and can not set up against him the statute of limitations, yet, if the mortgagee has made an attempt to foreclose the mortgage, although ineffectual and invalid, and holds under such attempted foreclosure, he is to be considered as holding adversely to the mortgagor, and may set up the statute of limitations. The court say: " After a foreclosure, or an effort to foreclose the mortgage, by decree or deed which purports to have that effect, the presumption then arises that all acts done in reference to the property, are done under a claim of ownership, by the mortgagee, and referred to his color of title. If they are such as are required by the statute, and for the period of time designated by the statute, they would form a bar to a redemption." Page 520. " It must be held that this effort to foreclose was such an act as authorized the mortgagee to act under claim in himself, and not subordinate to the title of those claiming the equity of redemption. That proceeding manifested to them and to the world that he no longer recognized them as having any rights in the premises. That act was hostile to their rights, and his subsequent acts must be regarded in the same light." The decree was reversed and the cause remanded. It subsequently came back to this court, and the title to a large amount of property was settled upon the principles above set forth. S. C. 29 Ill. 301, and 38 Ib. 343.

10—52ND ILL.

The case in 26th Ill. settles, beyond controversy, that the possession of Wheeler was, in law as well as in fact, adverse to appellant. His position is, indeed, a far stronger one than that of a mortgagee who holds possession under an invalid foreclosure, if, in this, there can properly be said to be degrees of strength. Tucker, the mortgagee, was the purchaser at his own sale. The sale was invalid only at the election of the mortgagor. Carver bought from Tucker, and received a deed. He went into immediate possession, and leased to Munger & Armour, who held for nearly a year, and then he leased to Wheeler. In this transaction, Carver bought from Tucker upon the theory that the mortgage was foreclosed, and the rights of the mortgagor extinguished. He did not buy from Tucker as merely the owner of a mortgage, but bought from him as the absolute owner of the property. He never, in any way, or at any time subsequent to the sale, recognized the mortgage as still in force. Whatever he did in regard to the property he did under a claim of ownership. How, then, can it be truly said that his possession was not adverse, as all his acts were, and were known to be by the mortgagor, or what element of actual trust was there in his dealings with the property?

But still less, if possible, was Wheeler under any trust restrictions. An entire stranger to the property and to all the transactions of these parties, he finds Carver in quiet possession, and leases it from him in the utmost good faith. His only obligation was to pay his rent and keep the other covenants in his lease. If Gibbs & Griffin had equities in the property, he was under no obligation to protect them. There was not the slightest privity of any kind between him and them. He owed them no allegiance. There was nothing whatever to create a trust relation between him and them. In fact, he sustained no relation to them different from that which he held towards other strangers in the community. Standing in this position of entire independence towards Gibbs & Griffin, and, as tenant of Carver, even occupying a position

adverse to them, he bought the fee of the lots from Wright & Hoffman. What element of wrong towards Gibbs & Griffin was there in his doing so? He made no false representations, he practised no concealment. He did not secure the fee by virtue of his possession, but even if he had, it would have been wholly immaterial, as his possession was not under Gibbs & Griffin but adverse to them. But it does not appear that his temporary possession, as Carver's tenant, in any way aided him in the purchase of the fee. Gibbs & Griffin knew all that he knew in regard to the title, and had equal opportunity with him to buy it. They had no prior right of purchase under their lease from Wright. That gave them no privilege of purchase whatever, but simply a right to payment for their improvements, and to retain possession until such payment should be made or secured. They had, indeed, indicated their design to terminate all connection with the property, by their notice given before Wheeler bought, of their intention to terminate their lease. Even if Wheeler had been the tenant, directly, of Gibbs & Griffin, we know of no principle of law that would have prevented him from purchasing the fee, or would have authorized them to insist that such purchase should be held in trust for them. They could only have insisted upon a restoration of the possession, and when he had restored that, he could have claimed whatever rights belonged to the ownership of the fee. They were not, however, Wheeler's lessors, and he stood in no species of fiduciary relation towards them.

It follows, from what we have said, that the claim of appellant to a conveyance of the fee from Wheeler, and to an account of the profits of his business in connection with the elevator since he took possession, is, in our judgment, utterly groundless.

Much stress has been laid, by counsel for appellant, upon the clause in the lease authorizing the lessees to retain possession until they should receive payment for their improvements under such a mode of valuation as was provided for by that

instrument. That provision gave them no interest in the fee nor any right of purchase. It was simply a security for their improvements, and provided that they should surrender possession upon receiving payment, or such security for payment, as the presidents of certain banks should pronounce sufficient. Their interest in the property was to terminate absolutely and forever at the election of the owner of the fee, upon the 1st of December, 1861, in case they should receive payment, or security for their improvements. Of what, then, can the appellant complain, since the court has, by its decree, given him full payment for the value of the improvements at that date, with interest to the date of the decree? Why should the court restore appellant to the possession in order that he may secure payment for his improvements, when he is made secure by the terms of the decree giving him a lien on the lots, and directing their sale in case of non-payment. To do this would accomplish no good end, would make the appellant no more secure in his rights, and would merely place it in the power of the appellant to inflict a great loss upon an innocent party, and lead to useless litigation. A court of chancery should use its power for no such purpose. A complainant can ask its aid only upon equitable terms, and when the court has amply secured him in the payment of all that is his due, he can not be permitted to object that the court has adopted that mode of doing him justice which will work least injury to innocent parties, such as we hold Wheeler, in this case to be.

But again, in reference to this point, it may well be asked, by whose act was it that appellant lost possession? Was it the fault of Wright, the original lessor? Was it the fault of Wheeler? Or was it because Gibbs & Griffin, by mortgaging their lease and improvements, placed themselves in a position to lose possession, as they did lose it, and thus, by their own act, rendered it impossible to literally carry out the provisions of the lease? Wheeler was ready to have the improvements valued, and gave notice to that effect to all the parties

interested, but a satisfactory valuation had become impossible in consequence of the controversy in which the mortgagees of Gibbs & Griffin had involved their claims. The owner of the fee was in possession when the lease expired, and he, certainly, was under no obligation to surrender the possession because Gibbs & Griffin and their mortgagees could not act together for the purpose of an appraisement.

Both parties complain of the mode in which the master has stated the account, and of the valuation placed by the court upon the improvements. We have examined the evidence bearing upon this branch of the case, and are satisfied that substantial justice has been done. The value fixed by the court on the warehouse is certainly as high as the evidence will warrant, and the opinions of the witnesses were very contradictory, and the circuit court knew much better than we can know the degree of weight to be attached to the varying testimony of the different witnesses. The same thing may be said in reference to the rent.

It is urged, by appellants' counsel, that they should at least have been allowed rents up to March, 1862, when Wheeler bought the improvements. But we do not find that Wheeler paid rent to the Marine Company after December 1, 1861, and the court allowed the appellant rent to that date, and gave him credit as of that date for the sum of $72,000, the value of the improvements, thus stopping the running of interest upon his mortgage debts. The value of his improvements, at that date, was all his lease entitled him to claim. He can not also have their rent after that date.

The appellant also insists that it was usury in the Marine Company to require Gibbs & Griffin to give their notes payable in New York, and renew them at intervals of sixty or ninety days, paying the exchange. We can discover no taint of usury in this. The exchange would not necessarily be in favor of New York. It might be at par or below, and of this uncertainty the borrower had the benefit. He might be so situated that it would cost him less to pay in New York than in

Chicago. In any event, he was under no obligation to buy the exchange from the company. He could buy it elsewhere, or send the money by express to meet his note. This is, in principle, like the case of *Stevenson* v. *Unkefer*, 14 Ill. 103, in which the court held that a note payable in Baltimore bank notes, with twelve and a half per cent. interest, was not usurious, because Baltimore bank notes might, at the maturity of the note, be under par, as, in this case, New York exchange might be.

We have gone over the salient points in this case, and do not deem it necessary to extend further this already long opinion. In our judgment, the circuit court has very happily succeeded in administering between these various parties substantial justice. Certainly the appellant has received all that is his due. He goes out of court with his mortgages paid, and with a money decree in his favor amounting, with interest, to about twenty-five thousand dollars, and with the West Lake Street property, the Clinton distillery, and whatever other property was included in the mortgages, disincumbered from their lien.

His claim that Wheeler shall convey to him the elevator property, now greatly increased in value, upon being reimbursed the cost of the fee, and shall account to him for the profits of his business from the time he leased the elevator to the present, we can not but regard as unreasonable in the extreme. If we were to pronounce such a decree, if we should compel Wheeler to surrender the title to the warehouse, and should strip him of the fortune which it is said he has made by the application of his capital and industry to this business during the last ten years, upon the theory that, by leasing a building from a person in its peaceful occupancy, and subsequently purchasing the lots from their undisputed owner, he had become an unconscious trustee for a person of whom he may have never heard, buying for his benefit and toiling for his profit—if we should render such a decree, we should certainly go far to shake the confidence of business men in the security

of their property, and Wheeler might well retire from this litigation with a profound conviction that the mysteries of the law are inscrutable, and the ways of courts past finding out.

*Decree affirmed.*